Good morning. We have three argued cases this morning and two submitted cases. The first argued case is number 2012-1311, MIKES TRAIN v. BROADWAY LTD. Mr. Ferguson. Thank you, Your Honor. Good morning, and may it please the Court. Brian Ferguson with Laudato Simone Anges on behalf of MIKES TRAIN HOUSE. The District Court's summary judgment grant of non-infringement should be reversed because the District Court both committed legal error in construing the claims and also committed error in evaluating the evidence in a manner that was unfavorable to MTH, the non-infringement. In both sets of claims at issue, the District Court first construed the claims in a manner that was inconsistent with the specification and then evaluated the evidence in a manner unfavorable to MTH by requiring MTH to actually prove infringement. That's a direct quote from the opinion of WAA-35 and JA-51. Prove infringement at the summary judgment stage, which of course is contrary to this Court's precedent as well as Supreme Court precedent. I'd like to address first the claims that require the speed command or desired speed limitations. These were claims 1 and 2 of the 640 patent and claims 4 and 5 of the 681 patent. The parties had agreed to a construction for these terms. If I understand the specification correctly, which one alternative embodiment here involves measuring the revolutions of the wheels of the train, correct to measure speed. That's correct, Your Honor. It does disclose that. Right. But if I understand correctly, the accused device just measures the back EMF, correct? The accused device measures back EMF in order to determine the speed at which the motor is running. It does not measure the revolutions of the motor or the revolutions of the wheels, right? It doesn't measure the revolutions of the – well, the back EMF is measuring the amount of voltage that the rotating motor is giving off, from which it determines the – Right, but it's not the same thing as the revolutions of the motor or the revolutions of the wheel. It's not the same thing as the revolutions of the wheel. That's correct. But from measuring the back – the voltage that's given off by the revolving motor, it – because the size of the motor is also set by the gears that run the wheels, you determine directly from that the speed of the train. In fact, the VLI stated in one of its summary judgment papers that measuring the speed of the motor, which is the back EMF, is the same thing as knowing the speed of the train. That's AJA815. But that issue relates to the speed control circuit, which determines the speed of the train as it's actually moving on the track, and then adjusts the train so that it continues to move at the same speed. The issue with respect to the grant of summary judgment of non-infringement of these terms was the actual input that the user gives to set the speed. Now, are you arguing that the user input should just be faster or slower? Our argument, Your Honor, is that the agreed-to construction is a user input corresponding to an actual desired speed of the train or the track in scale miles per hour or other units of speed. I get that. But it seems that you're arguing that actual desired speed in scale miles doesn't really mean a particular speed. It just means faster or slower. What it means is because we use the language corresponding to, not match or equal, what it means is that there can be a user input that, when adjusted, will cause a corresponding change in the speed of the train. That's all that was intended by this. And what the court did— Not that it actually matches the desired speed. Not that the user input has to be inputted as a specific scale mile per hour speed, which is what the district court said. The district court said that the user input in the construction has to, quote, to one discrete, specific value representing the speed of the train over the track, expressed in scale miles per hour. That's at JA55. And that is not what was intended by the construction. Certainly not what MPH intended. Well, why is it wrong? Because a user input is a broad term, and what the specification specifically discloses is two embodiments. One embodiment is, indeed, I have a user remote. I set a scale mile per hour speed. The train moves at that speed. We don't dispute that. That's the preferred embodiment. But there's another embodiment disclosed in the specification that matches exactly what the accused trains do, and that's that the user can set a voltage. That's not true that it does exactly what the accused trains do because that embodiment talks about measuring the revolutions per minute, and the accused train doesn't do that. The accused train measures the back EMF. Is that not correct? The accused train does measure the back EMF. Is my statement correct? The alternative embodiment measures revolutions, and the accused train does not measure revolutions. It measures only back EMF. Correct, for determining the current speed of the train. But, again, that does not relate to the user input. The user input, which is the speed command, speed command is our experience, the two claim terms. The user input described in the specification, there's an embodiment whereby a user can set the voltage, and the specification describes that the amount of, quote, the amount of voltage applied to the track is directly related to the desired speed for the trains on the track. Well, that's what the legacy trains did, right? No, there's a difference, and it's a very important difference, Your Honor. The difference is that in this embodiment, the voltage that's set by the user is translated into a digital signal. It says that at column 21, lines 39 to 40. In legacy mode, what happens is you set the train on the track, you connect a transformer to the track, and as you adjust the voltage up or down, it's an analog voltage signal that goes straight to the track. It's just reading the voltage and moving it. But what you're saying is this digital signal does not have to correspond to an actual speed? I mean, part of my problem is you agreed to a construction, and, you know, this is always frustrating when we're fighting over the court construction of the agreed-to construction. But, I mean, you seem to be backing off from the agreed-to construction because it says actual desired speed measured in miles per hour or similar measure. I mean, how do you get away from that being a measure of particular speed? We don't get away from that, and here's why. Because in the mode that we're describing in the specification where the user sets the voltage, it's sampled and converted to a digital signal which, quote, represents a speed command of the user. That is, the track voltage set by the user is indicative of the user's desired speed, column 22, lines 8, 21, lines 39 through 40. Now, what that means is that the user will know, this is just standard, that the train can, say, take a maximum of 20 volts. And so that amount can then be broken up into increments that the user can set. And if the user sets, it could be either, say, you could just have an arbitrary number, 1 through 20, you could define a finer, 1 through 100, or you could define it in terms of percentage of the voltage. So, for example, I could say I want it to run at 50%. I set it to 50%. That corresponds to a particular speed of the train that is half the amount of voltage, which, in other words, would be half the maximum speed of the train. I have this vision of cruise control. So you're saying, in cruise control, you set a particular speed. You set the number. Correct. And you're saying that that doesn't happen? No. What I'm saying is that there are two embodiments described in the specification, and it was certainly our intention that we were going to capture both of those. Well, that may be true, but your problem is that the alternative embodiment on which you're relying is not what the accused train does. Your Honor, the reason why I struggle with that is because what you're discussing is what happens after the command is sent from the user. After the command is sent, say I want, again, if I could use my example, I use 50% of maximum speed. That's just not true that the accused train does not reflect what the alternative embodiment reflects. What the accused train absolutely does is take that number of 50%. We talked earlier about the alternative embodiment measuring the revolutions. You agree that the accused train doesn't do that. So the accused train is not doing what's described in the alternative embodiment. That's correct, right? No, Your Honor. Here's why. Why not? Because the two embodiments that I'm discussing relate to the user input. What you're describing with the back EMF is a different part of the claim. It's the speed control circuit. I have no idea what you're talking about. Tell me why the accused train is not different from the alternative embodiment, because you agreed, I thought earlier, that they were different. As it relates to the limitation in the claim that discusses the speed control circuit, not the input that the user sets. The way that the user sets the input in the accused trains, the digital, what's called the speed step commands that the DCC standard operates under, is no different than this alternative embodiment. It sets it based on a percentage of the maximum voltage that can be applied to the motor. And if I, again, if I set 50% voltage, and in DCC, for example, you can define it, you can have 28 speed steps. I could set that at 14. That would be half maximum speed. In the accused trains, there's no question. They receive that command, drive the train to a speed that matches the 50% voltage. What Your Honor is referring to is what happens after that, which is as the train is moving at that speed, at the 50% voltage level, how does it maintain that speed as it goes uphill or downhill or starts pulling more trains? That relates to what's called, as Judge O'Malley mentioned, the so-called speed control. Maintaining the speed, maintaining the train at the exact speed. So you're saying that maintaining the speed is not part of the claim? It is part of the speed control circuit, which is not at issue in this appeal. The back EMF is a way to maintain the current speed of the train. That was not in dispute. What is in dispute, what the judge did, the district court judge, was to, we believe, limit the claim construction improperly by ignoring this alternative embodiment that matches what the accused trains do, which is to set a specific voltage, which in turn corresponds to a speed of the train that the user wants. So with respect to the claim construction, we don't believe that the district court's construction was consistent with the specification. Therefore, we believe it's a legal error that should require reversal by this court. Now, there was also the issue of how the district court misconstrued the evidence against MTH. The one I want to focus on here relates to the fact that the user, and this again was undisputed, the fact that the user can set these speed demands to match specific speeds that the user wants. So once you get your train, you then have the ability to set the speeds so that two separate different trains can run at the exact same speed under the exact same speed command. This is a capability that the accused trains have. We told the district court this. The district court says, well, I don't care about that. It doesn't matter. When in fact, these are not method claims. These are apparatus claims. We showed that they have the capability to infringe as a result of this ability for the user to change the speed steps in each train so that they match a specific speed across all different models of trains. So we believe that that was error as well for the district court to construe the evidence in that way. And then, very briefly, I wanted to turn to the smoke command, to the smoke claims. Those are 6 through 13 of the 640 pact. Here, the issue is that the smoke is based on the model train speed. What we believe the district court did was to improperly limit that, to require that nothing else can impact the amount of smoke other than the speed of the train. When in fact, the specification says there's at least two factors that determine the volume of smoke, the speed of the train and the load on the motor. So what do you see as the difference between Claim 6 and Claim 7? Well, Claim 6 specifies that one factor that determines the volume of smoke is the speed of the train. Claim 7 then adds in addition to that, because Claim 7 depends from 6, that in addition, the load on the motor does also vary the amount of smoke that's output. And that's consistent with the specification. The specification says both factors input or affect the amount of the volume of smoke. Okay, so the red brief spends a lot of time on the re-exam and how basically their belief is that in the re-exam you completely disclaimed essentially Claim 7. And you drop a footnote in the gray brief saying none of that matters. That was kind of a tepid response because it sure looked like it mattered. Okay, Your Honor, I'll ask that we look at the joint appendix J8-2554-76 is where we discussed that. What we say there is consistent with the specification. Both load and speed matter. We've never said that load doesn't matter. Load does matter. And under the preferred embodiment and the specification, there's no question that both are required. And that's why the district court's construction is incorrect because it eliminates the fact that there can be at least two marriages. Your problem is that it has to vary with speed as well as load even under your own construction and that there's no evidence that the change in speed causes a change in the volume of smoke in the accused train. I disagree with that, Your Honor. There is evidence. We submitted evidence and this is the problem. The district court only focused on the heater that heats the oil that generates the smoke. The district court ignored the fan. You have to have the fan to blow the smoke out. And the fan, no dispute, the fan's operation is tied directly to the rotation of the motor which is based on the speed of the train. That's J8-2255-56. That was undisputed. But what I don't understand is, you know, I understand your concept that load will increase speed and will also increase smoke so that they can be tied together in that sense. But didn't you specifically disclaim any increase in smoke based on load? No, we did not, Your Honor. We said that you have to take both into account in order to effectively have real-life operation of trains. That's what you say in your spec, but that's not what you said in your re-exam. We didn't distinguish the prior art. We did say that in our re-exam. If I may have a minute on rebuttal, I'll find that and make sure I respond to that question. I might have run over. We'll give you one minute. Thank you very much. I'll find that, Your Honor. Mr. Korten. Good morning, Your Honors. I'm Wiley Korten here on behalf of BLI. I would like to start with a couple of specific points that were raised. The first question about the disclaimer during the re-examination, if I may point the Court to the right section. Why didn't you point the District Court to this information? The issue didn't arise, Your Honor, until the motion for re-hearing, so you may recall from the history of the case. Well, the motion for summary judgment was pending when the re-exam was final. That is correct, Your Honor. So it wasn't the motion for reconsideration. You had time before the Court ruled. We did. The truthful answer is bad law, Your Honor. I don't perceive everything necessarily automatically in every case. As I was reviewing it to brief this issue, went through it again, and saw that. That's the truthful answer. The specific statement that MTH made that Your Honor was alluding to was distinguishing between varying the volume of smoke based on train speed versus varying it on the basis of motor load. And the context of this, Your Honor, is that they were attempting to distinguish the 017 Steverson patent before the Patent Office. This is at JA 2648 and the pages after that. What they say is, even if read as processor-controlled load-based manipulation of smoke, yet that is, Steverson did not teach processor-controlled synchronization of smoke based on speed. And he then says, in real train and model trains alike, speed is often independent of load. And a couple of pages later, speaking of the O-Gauge Railroad article, which also spoke of load-dependent smoke generation, MTH says, moreover, even assuming argumento that the OGR article refers to using a processor to adjust smoke based on load, that is how hard the motor is working, adjusting smoke based on load is not the same as adjusting smoke based on speed for the reasons already discussed above with respect to Steverson. Mr. Steverson, Your Honor, actually originally developed our control boards. We are a licensee of that Steverson patent. That is how our device operates. We vary smoke exclusively on the basis of motor load. And that's undisputed and record evidence. But you have to have a disavowal,  because the fact is very clear that what is claimed is varying volume of smoke based on speed, because that increases the puffing, the amount of puffing, and varying the amount of smoke based on load. I mean, that's what Claims 6 and 7 do. They're both there. The fact is very clear that there's two different ways to increase volume of smoke. So, absent a disavowal or a clear disavowal, how do you get around that? I respectfully disagree, Your Honor, and here is my response to that. It's true that this fact discloses varying based on speed or on load on both. When you look at the claim structure, Claim 6 says volume of smoke is varied on the basis of motor load. Claim 7 then, depending on Claim 6, adds smoke based on, or smoke volume being varied on the basis of speed. You have it backwards. 6 is speed, 7 is load. You're correct, Your Honor. 6 requires it to be exclusively based on speed. I'm sorry, requires it to be based on speed. They can't meet that limitation because there's no evidence that we vary the volume of smoke based on speed. So, what you're saying is, even if there wasn't a disclaimer of varying volume based on load in the prosecution history, that still, to some extent, the train has to be capable of varying smoke volume based on speed, and it doesn't do that. Correct, Your Honor. That is a requirement of Claim 6. Which is the independent claim. Yes, sir. So, if you don't infringe the independent claim, of course, the dependent claim becomes irrelevant. 7 being a dependent claim off of 6, if we don't infringe 6, we don't infringe 7. And that's my response. There's one point in the record that I do want to clarify, because this was made in the reply brief, and we've not had the opportunity to rebut it. There are, in a couple of instances, a statement made, and it's attributed to my company's president, Mr. Robert Grube. The quote that's made at page 2 of the reply brief is that smoke volume increases as the synchronized puffing rate increases, and that a faster puffing rate produces a greater amount of smoke. There's no dispute that the puffing rate is synchronized to the speed of the train. There's a mechanical magnetic sensor that makes it puff faster, and the chuffing sound is faster if the train increases and decreases in speed. But that quote, Your Honor, which cites the JA-0691, that's actually our brief. I'm not sure why that was cited. But the base material is Mr. Grube's original declaration turned in in the first summary judgment file in this case, way back in the case where it started, and that's JA-708. That quote is taken, with all respect to the opposing counsel, completely out of context. If you look at the actual declaration of Mr. Grube, the very first sentence in the paragraph once the quote is taken is, this is JA-0845, Your Honor. It's paragraph 20 of the first declaration of Mr. Grube. The first sentence in that paragraph is, the vast majority of smoke units sold in the U.S. before 1999 contain a feature whereby puffing or smoke volume is proportional to puffing, and puffing, of course, is related to speed. That's talking about legacy model trains, no processors, hardwired legacy model trains, the type of which I played with when I was a kid. It's referring to trains that were created ten years before the products in question in this litigation. There's absolutely no ambiguity in this record suggesting that this statement referred to the defendant's trains. The same quote was made to the district court. The district court saw them to take them out of context and rejected it, in its opinion, at JA-34. The logic, though, here is that you increase load and you increase speed, right? Except in certain conditions, when you're increasing load, you're increasing speed, right? If every other variable is the same, Your Honor. If you don't change the load, if you don't change the number of cars that you put on the train, if you don't send the train around a curve, if you don't send the train up or down a hill, if you run the train on a straight, flat level track with a constant load on it, and you increase throttle setting, which is what our trains do, they respond to a throttle setting, then the motor load would increase and the speed would increase. So there's no question there's a correlation. But the claim language says it has to be based on, and based on our position, and I believe the case law supports this in this, based on does not mean a correlation. Based on means a fixed relationship between. That's the cases that we gave you in the brief. And they haven't been able to demonstrate this because it's not true. Our trains don't do that. But do you think fixed relationship between means that it has to occur 100% of the time? A fixed relationship doesn't say it has to be linear, but it would have to occur 100% of the time. Yes, Your Honor. So, I mean, there is generally a fixed relationship between load and speed. I mean, because every time you increase the load, the train will move faster. Even if it's going up a hill, the more load it has, it's going faster than it otherwise would be going up that hill. Right? I would disagree with that statement, Your Honor. If you increase the throttle to one of our model trains as it pulls onto a grade, its speed may decline precipitously. They often move in opposite directions, including the friction that occurs as the train moves around a curve. The analogy really is to the gas pedal in a car. I think the district court used this analogy, too. We all understand that the gas pedal is the throttle setting and any other speedometer telling you how fast the car is going. In general, if you're stopped and you floor the gas, the speed increases. We know this. But we also know that a constant throttle setting when you're driving a car is not going to produce a constant speed. The speed is going to go up and down dramatically depending on the driving conditions. The same is true of our model trains running around a layout. There are curves, hills, and everything else. That's what the legacy trains did, right? Yes, sir, that is what the legacy trains did. They don't purport to be claiming what the legacy trains did. Well, with some possible exception to some of the stuff I heard this morning, I would agree. These things are digital commands. They're ones and zeros in a train track. I would, Your Honor, like to briefly discuss the EMF issue because I know the Court had a couple of questions on that. I'm not disagreeing with any of the observations the Court has made, but there were several statements made by counsel for MTH to the effect that we measure back EMF and we then use that to determine the speed of the train. I must point out to the Court that there is simply no record evidence supporting that contention. Yes, we measure back EMF. There's nothing that suggests our processor is capable of converting that into a speed of the train. And, in fact, the record evidence, specifically the testimony of Marty Pearson, suggests just the opposite. To explain that briefly, an electric motor, you can take the power off of it and measure it as a generator, as I think the Court well understands, if you know certain other information. If you have a speed curve for that motor that converts back EMF generated to the rotational speed of the motor and then you also have the final drive ratio, the size of the wheels of the train, all this other stuff, you can have a mathematical model in the microprocessor that could convert that to speed. MTH's patent, Column 22, actually talks about doing that, although it correctly suggests it's a rather crude way to do it. The problem is our processor doesn't have that information. That's undisputed. We don't have the motor curves. So while it could be done theoretically, we don't. We do not convert to the present speed of the train. So you're saying all you do is search faster or slower? Yes, Your Honor. There's literally a knob in the user's hand. It's digital, but it really runs a lot like the trains I had when I was a kid. You turn the knob, the train goes faster, the user observes the train. The user likes how fast the train is going. The user leaves it there. If the user thinks it's going too fast, you turn the knob the other way. It's very much a visually observed thing because there's no automated system that says the train's going to measure a set defined speed and it's going to hit that speed. The appellant's system, and really this is what patently distinguishes it from the older DCC systems, has what is admittedly a more sophisticated and in some respects a more desirable system. The user can actually put in a command that says I want you to go 20 scale miles per hour or 10 scale miles per hour, whatever you want it to be, and you can run off and grab a cup of coffee and come back and the train's going to accelerate smoothly and hit that speed and it's going to hold that speed. We don't have that capability and that's the key distinction between us and what they're reciting in the claims of the fact. The one other point I would like to make on backing up is I don't want to leave the court with a miscomprehension of what I'm saying. We do use the old prior art load control technology which has been around since the 70s. It's not new to MTAs. Load control means this. If you can measure the back EMF off of the DC motor, which is voltage, the voltage of the motor while you interrupt the power today, you're just converting it to a generator, measuring back EMF. You don't necessarily know how fast the motor is spinning. We don't know that because we don't have the motor speed curve information, but you do know if you hold that speed, that EMF constant, that the motor's neither speeding up nor slowing down. That's called load control. It's a little bit like cruise control in a car, except that cruise control in a car you actually have the speed. It would almost be like if you had a button you could hit in a car. I guess some do work this way. You don't know what speed you're going, but you hit a button and it just keeps the speed there. We do have that capability, but that doesn't meet the definition of either speed command, which requires a set speed to be specified, or the second part of speed command, which has really been ignored in MTAs' brief. If you recall from the history of this thing, we did agree on the definition of speed command, but we hotly contested the definition of speed control circuit. Well, they're related. It's difficult to speak to one without the other because the speed command is the digital command that's fed into the speed control circuit, and the speed control circuit has knowledge of that command speed, that is a specified speed that the train is supposed to be traveling, and then it automatically adjusts power to the motor to accelerate to that speed and hold it there. So when I'm reviewing this thing, I have to think about both to really make sense of it. You have the speed command, and then you have the speed command used by the speed control circuit. Under their proposed construction in Markham, speed control circuit was very broad. It just said load control, basically anything that can hold a speed constant, whatever speed that might be. We argued for a more narrow construction. We argued to say, no, it has to have knowledge of the speed command, and it has to accelerate the train to that speed and hold it there. We won that issue before the district court, and the importance for our purposes today, as far as I can tell from the reasoning of the argument today, that ruling has not been contested. So in my view, it's important in understanding speed command to understand the speed control circuit that uses it. And the main reason I make that point is the definition that's been urged by the appellant, which is simply, or at least it appears to me, some command that causes the train to move and the resulting motion can be measured in scale miles per hour. Such a command as that wouldn't be useful to the speed control circuit. It wouldn't know what to do. Well, when your system detects a speed and then captures that speed and says, hold it at that speed, and you concede you have that capability, why is that if not a speed command to a desired speed? I would disagree, Your Honor, that we capture a speed. What we capture is a motor voltage, and we hold the motor voltage constant. The critical distinction is we don't have the capability in our system to convert that motor voltage to a speed. Well, and the speed is not necessarily proportional to the motor voltage, right? Not necessarily, Your Honor. It varies from motor to motor. That's the problem. If you don't have that information, you can't convert it. Okay. Thank you, Mr. Horton. Thank you, Your Honor. Mr. Ferguson, you've got one minute left. Okay. Thank you, Your Honor. Let me start quickly by addressing this issue about the BAC-EMF, and I want to dispute something that BLI's counsel just said. At page 2253, this is the testimony of Mr. Gruba, the owner of the company. He testifies that I asked him, how do you determine and maintain the speed of the train? And he said, we use a process called BAC-EMF. I asked him to explain it. He said, you can read that voltage to tell how fast the motor is going. And then he says, we read that voltage it generates, and from that, we can gauge how fast the train is going. So they do know, they do use the BAC-EMF in order to determine the speed of the train. There's a relationship between the voltage that's generated by the motor and the speed of the train. Going to the prosecution history issue, 2648 in the appendix, the issue, claim six requires that it be based on speed. Claim seven says load. What we told the PTO was that you have to take both into account and that the Severson patent only addressed load, not speed. So there was not any disclaimer with respect to speed and load together. I think we're out of time. Thank you, Mr. Curtis. Thank you, Your Honor.